John W. McDOWN, Bea V. McDown and Juanita McDown Moody, Plaintiffs-Respondents,

v.

R. V. WILSON and Mavis Wilson, Defendants-Appellants.

No. 8670.

Springfield Court of Appeals.

Missouri.

March 6, 1968.

James E. Curry, Ava, for defendants-appellants.

Albert F. Turner, Mountain Grove, Clyde Rogers, Gainesville, for plaintiffs-respondents.

STONE, Judge.

In this suit in equity, defendants appeal from a money judgment for $12,750 entered in favor of plaintiffs. The litigation was spawned in the home of Mrs. S_____, a notary public (hereinafter referred to as the notary) in Cabool, Missouri, who undertook to "write up" the papers reflecting the terms of agreement between plaintiffs and defendants for the sale of plaintiffs' farm for $33,250 and the sale of their cattle and "machinery" for $12,750.

Plaintiffs John W. McDown and Bea V. McDown, residents of the State of Oklahoma, owned an undivided one-half interest in a 500-acre farm in Douglas County, Missouri, and in certain cattle and "machinery" thereon, and their widowed daughter-in-law, plaintiff Juanita McDown (now Moody), then residing on that farm, owned the other one-half interest in the farm, cattle and "machinery." Plaintiffs having reached an oral agreement to sell to defendants R. V. Wilson and Mavis Wilson, husband and wife, then residents of Dunklin County, Missouri, one Frank McCart, "the real estate man" who had brought the parties together, took them to the notary's home about 5:00 P.M. on Saturday, September 4, 1965, for the purpose of drawing appropriate documents. With all of the parties and McCart seated around a table in the same "little room" in the notary's home, she prepared two instruments, to wit:

1. An "Offer to Purchase with Acceptance" (hereinafter referred to as the farm contract) on a printed form used by E. A. Strout Realty Agency, Inc., whom McCart represented, in which defendants Wilson, as buyers, offered to purchase plaintiffs' 500-acre farm for *Thirty Three Thousand Two Hundred Fifty & no/100* Dollars payable as follows: *One Thoursand* (sic) Dollars deposited herewith, receipt of which is hereby acknowledged; *in Escrow to be applied on $30,000.00* Dollars in cash or certified check on .......... *Thirty Thousand and no/100* Dollars as hereinafter provided *to be paid within 90 days* ..... *Three Thousand Two Hundred fifty Dollars to be carried as second deed of Trust on Real Estate."* (The italicized words and figures were typewritten; the remainder was printed.) Plaintiffs McDown, as sellers, signed the printed acceptance on the same form. Although the closing date under the farm contract was extended, defendants were unable to borrow the required cash; and about February 8, 1966, the farm contract "was terminated" and the $1,000 deposited in escrow by defendants was forfeited. No claim under, or issue pertaining to, the farm contract is presented in the case at bar.

2. A "Bill of Sale" likewise on a printed form, in which it was recited that plaintiffs, as "grantors," "in consideration of the sum of *$12,750.00 as follows* to *them* paid, the receipt of which is hereby acknowledged, do hereby Sell, Assign, Transfer, Set Over and Deliver" unto defendants the personal property thereafter listed and described with a value assigned to each. The assigned values aggregated $13,125 but were followed by the deduction *"Less Disc. $375.00,"* which resulted in a net total of $12,750. Listed personalty included *"Cows-Ap 74=7,000.00."* All of the other listed personalty was lumped under the heading of, and was treated as, *"machinery."* (The italicized words and figures were typewritten; the remainder was printed.) The following terms of payment were typewritten immediately following the listed personalty in the bill of sale:

"Payment of Cattle amount $7,000.00 to be paid as follows:

"½ to be Paid Sept. 4, 1966—Inter 5½% to be paid on full amount.

"½ to be paid Sept. 4, 1967—Inter. 5½% on last half or balance

"Machinery $5750.00—Payment deferred to Nov. 1, 1968 Interest 5½% to be paid annually

"Machinery payments—1st pmt $1437.50 due Nov. 1, 1968 Int 5½%
2nd pmt $1437.50 due Nov. 1, 1969 Int 5½%
3rd Pmt $1437.50 due Nov. 1, 1970 Int 5½%
4th Pmt $1437.50 due Nov. 1, 1971 Int 5½%"

The bill of sale closed with conventional covenants and warranties by plaintiffs-grantors, all three of whom executed it before the notary who completed the forms of acknowledgment on the reverse side.

With respect to what occurred thereafter at the notary's home on September 4, 1965, the evidence was in conflict (a) as to whether or not plaintiffs authorized or had knowledge of delivery of the bill of sale by the notary to defendants-grantees, and (b) as to whether or not, immediately after the farm contract and the bill of sale had been executed, the parties had some further discussion concerning the personalty and orally agreed that at some subsequent date defendants-grantees would execute a note and "security instruments" covering the personalty.

*As to (a).* When plaintiff John W. McDown was asked whether defendants had received a copy of the bill of sale at the notary's home on September 4, 1965, he replied, "I don't know . . . not to my knowledge." To a similar inquiry, plaintiff Juanita McDown Moody responded, "well, she [the notary] had a lot of papers there and she gathered what she thought should go here and there and when she handed them [defendants] theirs, we didn't go over and examine what she handed them." In any event, neither plaintiff John W. nor plaintiff Juanita authorized (so they said) delivery of a bill of sale. On the other hand, the notary, called as a witness for defendants, testified that the farm contract had been prepared and "distributed" to the parties first, and that, after the bill of sale had been executed, she had asked to whom she should give the original and, being directed to do so by plaintiff Juanita, she had handed the original to defendant R. V. Wilson and the copy to Juanita's father-in-law, plaintiff John W. According to defendant R. V., the notary "asked [plaintiff John W.] if the bill of sale went to me and he said 'yes.'"

*As to (b).* Immediately after the farm contract and the bill of sale had been exe-

cuted and while the parties were still in the notary's home and presence, they orally agreed (so plaintiff John W. said) that "there was to be mortgage papers executed on the cattle and machinery" or (so plaintiff Juanita stated) that "we would talk more and make out an instrument of some kind for security for the cattle and machinery"—"a mortgage or some sort of security for the cattle and machinery." To the contrary, both defendants and the notary testified positively that there was no such conversation or agreement concerning the execution of additional instruments in the future. Whatever may or may not have been said in the notary's home on September 4, plaintiff John W. quickly conceded upon trial that he and his wife, who had been in Missouri only one day on that trip, "were in a hurry to get home that day" and that they left for Oklahoma "after the papers were prepared."

According to defendant R. V. Wilson, plaintiff Juanita continued to care for the cattle "for about two weeks," but thereafter he tended them, furnishing at his expense such salt, minerals and feed as were needed and making one or two trips each week from his then home to the 500-acre farm in Douglas County until he and his family moved onto that farm about December 6, 1965. Plaintiff Juanita asserted that all care required by the cattle was rendered by her until she remarried and moved from the farm on November 12, 1965, and that for a short time thereafter such care was rendered on her behalf by one Austin Cox. But there was no dispute about the fact that, with plaintiffs' knowledge and consent, defendant R. V. and his family had moved onto the 500-acre farm about December 6, 1965, and thereafter had been in actual possession of the cattle and "machinery" thereon. When the farm contract "was terminated" about February 8, 1966, defendants returned to Dunklin County, taking with them all of the personalty described in the bill of sale; and during September 1966, they sold all of the cattle and most of the "machinery" at a public sale, from which

net proceeds of $7,300 were realized. Although admitting their obligation to pay for the cattle and "machinery" in accordance with the terms embodied in the bill of sale, defendants had paid nothing on that debt to the time of trial.

This cause was instituted on February 14, 1966, and came on for trial before the court upon plaintiffs' first amended petition in four counts on October 3, 1966. In *Count I*, plaintiffs averred that, "contemporaneously with the execution of the written [farm] contract" on September 4, 1965, the parties "entered into negotiations concerning the purchase by defendants from plaintiffs of certain personal property," as a result of which "it was verbally agreed . . . that defendants would, at the time of the transfer of said real property to defendants, purchase from plaintiffs the said personal property"; that, "upon the conclusion of the transactions between the parties, certain additional documents were to be executed and delivered, including . . . a promissory note for the purchase price of the personal property and security agreements and financing statements with respect thereto"; that, "in preparation for the conclusion of said transaction, [the notary] prepared a certain bill of sale"; but that, through the notary's "mistake and error," defendants obtained possession of the bill of sale without payment of any consideration. Finally, it was asserted that, upon "cancellation" of the farm contract, "the said verbal contract" for personalty was also cancelled; but that, though *"defendants have no right, title or interest in or to the said* [personal] *property,"* they nevertheless have removed a large portion thereof and *"have unlawfully and wrongfully converted the same to their own use."* (All emphasis herein is ours.) The prayer of Count I was (a) for a temporary injunction restraining defendants from removing any additional personalty described in the bill of sale, (b) "that the court find, adjudge and decree . . . that *defendants have no right, title or interest in and to any of* said [personal] *property, nor any right to possession thereof,"* (c) that defendants be ordered to return to plaintiffs all personalty removed from the 500-acre farm and still in defendants' possession, and (d) for judgment *"for compensatory damages* for any property not returned by defendants and for any damages to or depreciation of said property."

In *Count II,* plaintiffs sought a judgment of $500 for the alleged wrongful conversion of other items of personalty not described in the bill of sale. In *Count III,* plaintiffs incorporated by reference all allegations in Counts I and II, charged that "defendants, in removing the aforesaid personal property and *converting the same to their own use,* acted wilfully and maliciously," and then prayed for punitive damages of $2,500.

In *Count IV,* plaintiffs incorporated by reference all allegations in Count I, then repeated in substance the averments of Count I concerning the alleged "oral contract" that "if the said personal property was finally purchased by defendants" they would execute and deliver their promissory note, security agreement and financing statement, reiterated defendants' failure and refusal to pay for the personalty or to execute said note, security agreement and financing statement, and then asseverated that "a justiciable controversy exists between the parties as to the existence and meaning of the said oral contract and as to the rights of the said parties under the terms of said contract." The prayer of Count IV was (a) that "the court construe the said oral contract and declare the rights of the plaintiffs and defendants thereunder," (b) that "the court find and declare that the defendants are obligated to execute their promissory note, payable to plaintiffs, in terms as set forth in the above described bill of sale, together with a security agreement and financing statement as aforesaid," (c) that "the court enter its order requiring defendants to execute" said instruments, and (d) that "the plaintiffs have such other and further relief as shall be just and proper, and for the costs of this action."

The material portion of the "judgment and decree" entered on October 27, 1966, was: ". . . the court finds the issues for the defendants on Counts one, two and three of plaintiffs petition; the court finds for the plaintiffs on Count four of plaintiffs petition; the court further finds that the defendants are indebted to the plaintiffs in the amount of Twelve Thousand Seven Hundred Fifty Dollars ($12,750.00) as prayed for in Count four of plaintiffs petition; . . . plaintiffs are therefore awarded a judgment in the amount of Twelve Thousand Seven Hundred Fifty Dollars ($12,750.00) against the defendants . . . ."

The substance of defendants' points relied on is that the trial court erred (a) in receiving, over defendants' objections bottomed on the parol evidence rule, testimony concerning the oral agreement alleged to have been reached in the notary's home on September 4, 1965, immediately after execution of the farm contract and the bill of sale, that defendants would execute a note and "security instruments" covering the cattle and "machinery," and (b) in entering judgment for $12,750 on Count IV because (1) plaintiffs did not specifically "ask for a money judgment" in that count and it did not "raise the issue of a money judgment" and (2) the evidence in general, and plaintiffs' testimony in particular, did not justify or support such judgment.

■ *Of point (a)*. In briefing and discussing this point at length, opposing counsel have overlooked the fact that the meeting in the notary's home was subsequent to July 1, 1965, the effective date of the Uniform Commercial Code [V.A.M.S. § 400.10–101; Laws of 1963, p. 637], which included the following legislative enactment relevant and controlling here: "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with re-spect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement *but may be explained or supplemented* . . . (b) *by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.*" V.A.M.S. § 400.2–202; Laws of 1963, p. 519. With no indication in the record that the trial court found the bill of sale "to have been intended also as a complete and exclusive statement of the terms of the agreement" for sale of the cattle and "machinery," the trial court cannot be convicted of reversible error for receiving the parol evidence under consideration, i. e., that defendants would execute a note and "security instruments" covering the personalty, since that evidence was not offered in contradiction of the bill of sale but rather as tending to show "consistent additional terms." King, The New Conceptualism of the Uniform Commercial Code, 10 St. Louis U.L.J. 30, 58–63.

■ *Of point (b) (1)*. By their first amended petition, plaintiffs sought, inter alia, in Count I thereof (1) injunctive relief and (2) an adjudication that defendants had no right, title or interest in and to the personal property—an adjudication in the nature of a declaratory judgment [V.A.M.S. Chapter 527] which, although sui generis and not strictly legal or equitable, is equitable by historical affinity [Gurniak v. Liszewski, Mo., 411 S.W.2d 84, 86(4); Pittman v. Faron, Mo. App., 315 S.W.2d 836, 839(3)], and in Count IV thereof (1) an adjudication in the nature of a declaratory judgment construing the alleged oral agreement (i. e., that defendants would execute and deliver their note and "security agreements" covering the personalty) and declaring the rights of the parties thereunder, and (2) specific performance of that oral agreement, purely an equitable remedy governed by equitable principles. Hoover v. Wright, Mo., 202 S.W.2d 83, 86(2); 81

C.J.S. Specific Performance § 1a, p. 408; 49 Am.Jur. Specific Performance § 2, p. 6. The case clearly was one of equitable cognizance when it was instituted and when it came on for trial.

■■■ Once rightfully invested with jurisdiction of a cause, a court of equity will retain jurisdiction to do full and complete justice even though that may involve adjudicating matters of law or rendering a money judgment [Sebree v. Rosen, Mo., 374 S.W.2d 132, 138(8); Anison v. Rice, Mo., 282 S.W.2d 497, 502(4); Missouri Cafeteria v. McVey, 362 Mo. 583, 594, 242 S.W.2d 549, 553(8); Waugh v. Williams, 342 Mo. 903, 912, 119 S.W.2d 223, 227; Rockhill Tennis Club of Kansas City v. Volker, 331 Mo. 947, 972, 56 S.W.2d 9, 20]; and, this is particularly true where there is a prayer for general relief, as that in Count IV of instant plaintiffs' first amended petition for "such other and further relief as shall be just and proper." Walsh v. County of St. Louis, Mo., 353 S.W.2d 779, 785(3, 4); Anison v. Rice, supra, 282 S.W.2d at 502(5); Woods v. Cantrell, 358 Mo. 1006, 1014, 218 S.W.2d 613, 616. See Cannon v. Bingman, Mo.App., 383 S.W.2d 169, 173(2, 3); Wenzelburger v. Wenzelburger, Mo.App., 296 S.W.2d 163, 164–165(1–3). On the record presented here, we are unable to say, as defendants would have us to do, that no money judgment against them could have constituted "relief consistent with the suit tried." Branner v. Klaber, 330 Mo. 306, 332, 49 S.W.2d 169, 180; Cox v. Bryant, Mo., 347 S.W.2d 861, 863.

*Of point (b) (2).* However, it does not necessarily follow that the judgment for $12,750 entered on Count IV can stand. As a quick review of the hereinbefore-digested evidence and the first amended petition will confirm, plaintiffs' pleading far outran their proof. For example, whatever plaintiffs' undisclosed intention or unilateral understanding may have been, there was no competent evidence that the cattle and "machinery" were to be sold to defendants only if and when title to the 500-acre farm was conveyed to them. Certainly the farm contract and the bill of sale did not so indicate, for neither instrument in any wise referred to the other and the only mention of personalty in the farm contract was in this provision following the legal description of the realty, to wit, "All buildings, plumbing, heating, lighting fixtures, screens, storm sash, shades, blinds, awnings, shrubbery and plants if any, and the following described personal property located or used on said real property: *Butane Gas Tank is to go with property*—are also included in this sale." (The italicized words were typewritten; the remainder was printed.)

■■■ In this connection, we may not ignore the issues raised by Count I and the inescapable force and effect of the judgment for defendants entered on that count. That unappealed judgment must be recognized as an adjudication, adverse to plaintiffs, of the issues raised by Count I [Hardin v. Ray, Mo.App., 404 S.W.2d 764, 769(5–7), and cases there collected in note 5; M. F. A. Central Coop. v. Harrill, Mo. App., 405 S.W.2d 525, 526(1); Davis v. Broughton, Mo.App., 369 S.W.2d 857, 858–859], including those joined by defendants' denial of plaintiffs' averments that "defendants have no right, title or interest in or to the [personalty] . . . and have unlawfully and wrongfully converted the same to their own use . . . ."

Furthermore, plaintiff Juanita agreed with defendants' counsel on cross-examination that the bill of sale correctly listed the personalty being sold to defendants and accurately stated the sale price and the terms of payment. To the concluding question, "in other words, this document [the bill of sale] expresses the agreement accurately that you had with Mr. and Mrs. Wilson [defendants] on this date [September 4, 1965]," plaintiff Juanita responded with an unqualified "yes." Plaintiff John W. gave similar testimony on cross-examination, including the following:

"Q. And those terms that are listed on that bill of sale are exactly those that the parties agreed to there that day [September 4, 1965]? A. That's right. Q. There is no mistake about it? A. No." In passing, we observe that plaintiff John W. identified himself as a "farmer-rancher" and, when asked whether he had "dealt in real estate and farms" and was "familiar with matters of this kind," replied with assurance, "oh, yes."

Plaintiffs' counsel urge us to affirm the judgment for $12,750 as the only way to do equity between the parties under existing circumstances and argue, as a basis for such affirmance, that the trial court *could* have found that the bill of sale was delivered to defendants without plaintiffs' authorization or knowledge and that the parties orally agreed in the notary's home that defendants would execute a note and "security instruments" covering the personalty. We recognize, but set aside without discussion or ruling as unnecessary to proper determination of the appeal, serious questions immediately suggested by counsel's argument, e. g., (a) the inherent inconsistency of counsel's two-pronged argument that, on the one hand, the bill of sale was delivered without plaintiffs' authorization or knowledge by reason of which title to the personalty *did not vest* in defendants but that, on the other hand, defendants agreed to execute a note and "security instruments" covering the personalty—action necessarily predicated and dependent upon the premise that title to personalty *did vest* in defendants, and (b) apart from such inconsistency, as to the sufficiency of plaintiffs' vague, indefinite and inconclusive evidence to have warranted a decree of specific performance of an alleged oral agreement to execute a note and "security instruments." See cases collected in 26 West's Missouri Digest under Specific Performance, ⊛121(1) to 121(4), incl. It is sufficient to point out that, regardless of what the trial court *could* have found, the inescapable impediment remains that, in the teeth of the unappealed judgment for defendants which adjudicated the issues raised by Count I adversely to plaintiffs, we may not indulge the presumption that the court *did* make either finding advanced by plaintiffs' counsel in an effort to justify and support the judgment on Count IV.

■ Under the terms embodied in the bill of sale which both plaintiffs John W. and Juanita recognized upon trial as correct in every particular, only one-half of the $7,000 to be paid for the cattle was due and payable when the case was tried on October 3, 1966, and when judgment was entered on October 27, 1966, and no portion of the $5,750 to be paid for "machinery" was then due and payable. It may be noted here that an express provision therefor in the contract between the parties is necessary to accelerate the maturity of a bill or note [10 C.J.S. Bills and Notes § 251a, p. 746; Board of Trustees of Westminster College v. Piersol, 161 Mo. 270, 285–286, 61 S.W. 811, 814(3); Brinsmade v. Johnson, 192 Mo.App. 684, 695, 179 S.W. 967, 969–970(4)], and that, in the vague and indefinite testimony concerning the note which defendants allegedly agreed to execute, there was no mention of an acceleration provision.

■ Sympathetically attuned as our ear may be to plaintiffs' cry ad misericordiam, we find no basis on which we may affirm their judgment for $12,750 and no means by which we may fully relieve them of all unfortunate consequences of their own hasty and ill-advised conduct on September 4, 1965. However, upon trial defendants admitted their obligation to pay for the cattle and "machinery" in accordance with the terms set forth in the bill of sale. Hence, in the interest of justice, it is the judgment of this court (a) that the judgment of the Circuit Court of Douglas County, Missouri, for plaintiffs in the sum of $12,750 upon Count IV of their first amended petition should be and hereby is set aside and for naught held, (b) that

the cause should be and hereby is remanded to said circuit court with authority and directions (1) to take such additional evidence as may be necessary to ascertain the aggregate amount (including interest) due and unpaid, as of the date of such hearing, under the terms of payment embodied in the bill of sale and (2) to enter judgment on Count IV of plaintiffs' first amended petition in favor of plaintiffs and against defendants in such sum, all of which shall be without prejudice to plaintiffs' right thereafter to institute and maintain an appropriate action or actions for the recovery of such additional sums as may, from time to time, become due and payable under the terms of payment embodied in the bill of sale, and (c) that, in doing equity between the parties, the costs of this appeal should be, and hereby are, taxed against the parties, share and share alike, one-half against plaintiffs and one-half against defendants. Consult Rockhill Tennis Club of Kansas City v. Volker, supra, 331 Mo. at 972–973, 56 S.W.2d at 20–21; Bobst v. Sons, Mo., 252 S.W.2d 303, 305–306(5); Missouri Cafeteria v. McVey, supra, 362 Mo. at 597–598, 242 S.W.2d at 556; Selle v. Selle, 337 Mo. 1234, 1244, 88 S.W.2d 877, 883–884(10).

HOGAN, P. J., and TITUS, J., concur.